**UNITED STATES of America, Plaintiff,**

v.

**Nickandro Phillip UCCIFERRI, Defendant.**

**No. 6:90–CR–92–ORL–18JGG.**

United States District Court, M.D. Florida, Orlando Division.

Feb. 22, 2001.

Donald A. Lykkebak, Law Office of Donald A. Lykkebak, Orlando, FL, for defendant.

Matthew Hart Perry, U.S. Attorney's Office, Orlando, FL, for United States.

## ORDER ON REVOCATION

G. KENDALL SHARP, Senior District Judge.

This matter comes before the court for a hearing for the defendant to show cause why supervised release should not be revoked. A Report and Recommendation was filed on December 12, 2000 by Magistrate Judge James G. Glazebrook after an evidentiary hearing held October 31, 2000. The defendant appeared with counsel, Donald Lykkebak, and the government before this court on February 21, 2001. After hearing the parties, the court accepted the findings of the magistrate judge. The defendant's term of supervised release is revoked and the defendant is sentenced to **eighteen months** with credit for time served on this revocation and 109 days credit for time served in excess of his original term.

### REPORT AND RECOMMENDATION

GLAZEBROOK, United States Magistrate Judge.

On October 31, 2000, this Court heard evidence at a final revocation hearing on the Petition on Supervised Release filed October 17, 2000 [Docket No. 113], pursuant to Fed.R.Cr.P. 32.1 (revocation of probation or supervised release); 18 U.S.C. § 3401 (designation of magistrate to conduct revocation hearing); and Local Rule 6.01(c)(16) (delegation of violation proceedings to magistrate for report and recommendation). For the reasons that follow, it is **RECOMMENDED** that the United States District Court issue an order to show cause why Nickandro Phillip Ucciferri's supervised release should not be revoked.

## I. INTRODUCTION

On September 1, 1992, Ucciferri signed and filed a plea agreement. Docket No. 74. Ucciferri pled guilty to possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(b)(1)(c) and 846. Docket No. 74. On December 16, 1992, the Honorable G. Kendall Sharp sentenced Ucciferri to sixty-three months imprisonment followed by five years of supervised release. Docket No. 87. The district court also placed restrictions on Ucciferri's supervised release. Docket No. 87. Relevant here, the district court imposed standard conditions of supervised release requiring that Ucciferri not commit another Federal, State, or local crime;

not possess a firearm; and, not associate with known felons.

On January 5, 2000, the United States Probation Office filed its first Petition for Warrant or Summons for Offender Under Supervision, alleging that Ucciferri violated the terms of his supervised release: 1.) by committing the offenses of attempted homicide and aggravated battery with a deadly weapon in violation of Florida Statute §§ 782.051 and 784.045(1)(2); and 2.) by having in his possession a firearm as evidenced by his arrest on November 30, 1999.

On January 24, 2000, the Court ordered that Ucciferri be detained pending a final revocation hearing. After continuing the final revocation hearing on four different occasions to permit disposition of the charges in state court, this Court commenced the violation hearing on October 17, 2000. However, the Court further continued the hearing on the government's motion (for the fifth time), because the government wished to file a second Petition for Warrant for Offender Under Supervision. Later on that same date, the government filed the second petition alleging that Ucciferri further violated the terms of his supervised release: 1.) by associating with Michael Ponzio, a known convicted felon, without the permission of his probation officer; and 2.) by associating with Peter Cabrera, a known convicted felon, without the permission of his probation officer.

On October 31, 2000, the Court heard evidence at the final revocation hearing. The Court observed that the government had cited the wrong statutes in the amended petition. The Court allowed the government to amend the second petition at Docket No. 113 to reflect the proper citations to the Florida Statutes as follows: Ucciferri violated his supervised release by committing the offenses of attempted homicide and aggravated battery with a deadly weapon, in violation of Fla.Stat. § 782.04(1)(a)(1) and Fla.Stat. § 777.04 (in place of Fla.Stat. § 782.051), and in viola-

tion of Fla.Stat. § 784.045(1)(a)(2) (in place of Fla.Stat. § 784.045(1)(2)). In all other respects, the second petition remained the same.

During the October 31, 2000 hearing, the Court heard testimony from victim Manuel Garcia, United States Probation Officer Scott Fanelli, Officer Michael McLouth, Michael Ponzio, expert Dr. Milton Earl Burglass, and Special Agent Clarence Lawrence. Ucciferri did not testify.[1] Through his attorney, Ucciferri denied violating any of his conditions of supervised release.

## II. *THE LAW*

### A. Violation of Probation

If a defendant violates a condition of probation, the Court may continue him on probation with or without modification, or may revoke the sentence of probation and resentence him. 18 U.S.C. § 3565. The Court will consider the factors in 18 U.S.C. § 3553(a), and conduct a revocation hearing pursuant to Fed.R.Cr.P. 32.1. The statute also permits delayed revocation. 18 U.S.C. § 3565(c). The United States Sentencing Commission has issued a Policy Statement regarding revocation of probation. U.S.S.G. § 7B1.3.

When a probationer violates a condition of his probation, the sentencing court may revoke probation and impose any sentence which might originally have been imposed. *See* 18 U.S.C. §§ 3565, 3551; *United States v. Holland,* 874 F.2d 1470, 1472–73 (11th Cir.1989). In order to revoke supervision, the evidence must "reasonably satisfy the judge that the conduct of the probationer has not been as good as required by the conditions of probation." *See Holland,* 874 F.2d at 1472–73; *United States v. Robinson,* 893 F.2d 1244, 1245 (11th Cir.1990). Where the Court finds, by a preponderance of the evidence, that the defendant committed the violations alleged, the Court may revoke supervised release. *See* 18 U.S.C.

---

1. The Court draws no inference from Ucciferri's decision not to testify.

§ 3583(e)(3). The quantum of proof is not guilt beyond a reasonable doubt. *Id.*

■ Generally, once the Court determines that the probationer has violated a condition of his probation, the Court must next determine whether the violation warrants revocation. *Holland,* 874 F.2d at 1473. However, revocation of supervised release is mandatory if the defendant possesses a firearm while on supervised release. *See* 18 U.S.C. § 3583(g)(2). Under Sentencing Guidelines, revocation is also mandatory if the defendant commits a Grade A or B violation of supervised release. *See* U.S.S.G. § 7B1.3(a)(1). A Grade A violation includes conduct which is a crime of violence. *See* U.S.S.G. § 7B1.1(a)(1). A crime of violence is "any offense under federal or state law, punishable by imprisonment for a term exceeding one year that has as an element the use, attempted use, or threatened use of physical force" or "involves conduct that presents a serious potential risk of physical injury to another." *See* U.S.S.G. § 4B1.2(a).

### B. Attempted Homicide, Fla.Stat. §§ 782.04(1)(a)(1) and 777.04

The parties agree that the applicable law is as follows. Pursuant to Fla.Stat. § 777.04(1), a person who attempts to commit an offense prohibited by law and in such attempt does any act towards the commission of such offense, but fails in the perpetration or is intercepted or prevented in the execution thereof, commits the offense of criminal attempt. In order to show that a defendant attempted first degree premeditated murder, the government must prove (in this context by a preponderance of the evidence) that: 1.) the defendant did some act intended to cause the death of the victim that went beyond just thinking or talking about it; 2.) defendant acted with a premeditated design to kill the victim; and 3.) the act would have resulted in the death of a victim except that someone prevented the defendant from killing the victim or he failed to do so. Fla. Standard Crim. Jury Instruction 85 (Attempted Murder—First Degree (Premeditated), 28 U.S.C. §§ 782.04(1)(a) and 777.04). As further explained by the Florida Standard Criminal Jury Instruction 85:

A premeditated design to kill means that there was a conscious decision to kill. The decision must be present in the mind at the time the act was committed. The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the act. The period of time must be long enough to allow a reflection by the defendant. The premeditated intent to kill must be formed before the act was committed.

\* \* \* \* \* \*

It is not an attempt to commit first degree premeditated murder if the defendant abandoned the attempt to commit the offense or otherwise prevented its commission under circumstances indicating a complete and voluntary renunciation of [his criminal] purpose.

Fla. Standard Crim. Jury Instruction 85.

### C. Aggravated Battery With A Deadly Weapon, Fla.Stat. § 784.045(1)(a)(2)

The parties agree that in order to prove an aggravated battery, the government must show by a preponderance of the evidence that: 1.) the defendant intentionally caused bodily harm to the victim; 2.) in committing the battery, the defendant used a deadly weapon; and 3.) the weapon used was a deadly weapon because it was used or threatened to be used in a way likely to produce death or great bodily harm. Fla. Standard Crim. Jury Instruction 122.

### III. *ANALYSIS*

#### A. Findings of Fact

Upon consideration of all the evidence of record, the Court makes the following findings of fact. On the evening of October 21, 1999, Manuel Garcia and Ali J. Setordepour visited Michael Ponzio who

lived near Kissimmee. There, Garcia, Setordepour, and Ponzio consumed illegal drugs. Garcia smoked "kryppies" (potent marijuana) at Ponzio's residence. According to Garcia, it was "not very good," meaning that it did not affect him very much. Ponzio also consumed "kryppies" (by way of a "bong"), and stated that it did not have an effect on him.

After visiting Ponzio for approximately one hour, Garcia and Setordepour left the residence in a black Ranger pickup truck. Setordepour drove the black pickup, accompanied by Garcia in the right, front passenger seat. After leaving Ponzio's residence, Garcia saw a "purplish-red" truck illegally cross three left lanes in order to follow Garcia and Setordepour in making a left turn at Rosalind Avenue. They drove approximately 45 minutes towards 513 E. South Street, Orlando, Florida (the "513 residence"). Setordepour intended to meet the owner, Alice Chavis, to pick up some money relating to a drug transaction.

At approximately 10:47 p.m., Garcia and Setordepour arrived at the 513 E. South Street residence. They parked facing north in the driveway. There, Garcia swallowed a Rohypnol pill (a "roofie"). Setordepour went into the house, and Garcia remained in the pickup truck.

While parked facing north in the driveway, Garcia saw the same "purplish-red" truck pass him, traveling westbound. He then saw the "purplish-red" truck parked 100—200 feet down the block. The area was moderately well-lit with "yellowish" street lamps. Still looking westward from the passenger's side through the driver's side window, Garcia saw that the "purplish-red" truck's door was opened. He then saw the person he now knows to be Nickandro Ucciferri sneak in and out of several bushes while approaching eastward towards Garcia. Ucciferri wore blue jeans pants and no shirt.

When Garcia and Ucciferri made eye contact, Ucciferri held a black gun. In order to protect himself, Garcia removed the keys from the ignition and used them

to open the glove compartment. Garcia pulled a gun from the glove compartment, and chambered a round. He pointed the gun out of the driver's side window in Ucciferri's direction. At that point, Setordepour came out of the house and yelled to Garcia, "yo Manny—don't shoot." Garcia did not shoot. However, Ucciferri shot Garcia on the hand causing Garcia to drop the gun. Frantic, Garcia opened the passenger's door, and reached for the gun he had dropped. He kept low in the pickup's compartment by kneeling down on the bench seat of the truck with his feet on the left passenger's side and his head lying on the right driver's seat.

By then, Ucciferri was standing a few feet behind the driver's side of the truck. Ucciferri fired his gun several times in Setordepour's direction. During a lull in the shooting, Garcia raised his head to see what was going on. Through the back windshield, Garcia clearly saw Ucciferri standing just three to four feet behind the driver's side of the pickup truck at close range. Garcia observed that Ucciferri was a white male, "chiseled" (well-defined abdominal and pectoral muscles), with no hair on his chest. Garcia had never before seen or met Ucciferri. Ucciferri then fired a shot through the back rear window hitting Garcia near his left eye. The bullet shot Garcia's left eye out of its socket, and left it hanging on Garcia's cheek by tendons and nerves. Garcia fell out of the passenger's side onto the pavement. He then pointed the gun towards the back of the truck, just in case Ucciferri came around the truck. Ucciferri, however, had fled the scene.

In the meantime, Officer Michael McLouth had been traveling north on Summerlin Avenue near the intersection of South Street when he heard what he believed to be five or six gunshots nearby. Officer McLouth proceeded to the area of the gunfire, and was flagged down by Setordepour. Officer McLouth observed that Setordepour had suffered gunshot wounds to his left thigh and right buttock.

Officer McLouth also noticed that Garcia had sustained a rather "horrific" gunshot wound to the face. The left side of his face was blown off and covered with blood. Garcia's left eye was dangling on his cheek, held by what Officer McLouth believed were optic nerves and blood vessels. Nonetheless, Officer McLouth noted that Garcia was standing and appeared fairly lucid. Garcia could see from his right eye, and was able to converse with Officer McLouth. Garcia wondered whether he would be able to see with his left eye. Setordepour told Officer McLouth that the individual who had shot him was Anthony Romano. Garcia did not know the man who had shot them.

On October 22, 1999, Detective Harris met with Garcia at the Orlando Regional Medical Center. Detective Harris showed Garcia a photo lineup, which included Anthony Romano, but not Ucciferri. Garcia stated that the person responsible for the shooting was not included in the photo lineup. On November 19, 1999, Detective Harris showed Garcia another photo lineup containing Ucciferri. Garcia picked Ucciferri out of the photo lineup, and told Detective Harris that Ucciferri was not wearing a shirt during the shooting and was in good physical condition.

### B. Attempted First Degree Murder and Aggravated Battery With A Deadly Weapon

■ The Court finds that on the evening of October 21, 1999, Ucciferri did commit the offenses of attempted first degree murder and aggravated battery with a deadly weapon by shooting Garcia in the face and by shooting Setordepour in the back with a firearm. The Court finds Garcia's testimony credible and consistent with the testimony of Officer McLouth, Special Agent Clarence, and Dr. Milton Earl Burglass.

■ Defendant claims that Garcia's testimony should be given little weight, because Garcia was impaired on the evening of October 21, 1999 due to the type and amount of drugs he consumed that evening. Defendant relies largely on the testimony of Michael Ponzio. Ponzio, however, was not very credible. Ponzio testified that on the evening in question Garcia had consumed "kryppies" (potent marijuana) by way of a "bong"; six "roofies" (Rohypnols), three inhaled and three swallowed; cocaine; and beer.

But Garcia's conduct on the evening of October 21, 1999 is far more consistent with Garcia's testimony regarding the amount of drugs he consumed—i.e., Garcia smoked "kryppies" (marijuana) at Ponzio's home, as well as one Rohypnol pill minutes prior to the shooting.[2] Dr. Burglass, defendant's expert in addiction medicine from Harvard Medical School, admitted as much.[3] Dr. Burglass opined that Garcia would not have been able stand up and walk out of the door if he had consumed the amount of drugs described by Ponzio, unless Garcia was extremely tolerant of those drugs. Dr. Burglass explained that ingestion of the amount of drugs listed by Ponzio would have caused an individual to be in "deep space control," unless that individual had an extremely high tolerance for those drugs. Garcia's conduct on October 21, 1999 did not reflect that of an individual in "deep space patrol." Rather, the credible evidence demonstrated the opposite.

Garcia remained cognizant and lucid throughout the pertinent events of October 21, 1999. Garcia understood that the "purplish-red" truck had been following him and Setordepour. He was coherent enough to find the truck suspicious. He attentively followed Ucciferri's actions in sneaking in and out of the bushes. He

---

2. Dr. Burglass explained that it takes approximately 30 minutes for Rohypnol to takes its effect when swallowed. However, the evidence shows that the shooting occurred only several minutes after Garcia's ingestion of the Rohypnol.

3. Dr. Burglass has a solid understanding of the pharmalogical and neurologic effect of controlled substances on humans.

was able to correctly assess the gravity of the situation when seeing Ucciferri's gun. He took the necessary steps to protect himself by unlocking the glove compartment and by cocking a gun. During the shooting, Garcia understood that he needed to keep himself hidden from Ucciferri.

Even after having been shot point blank in the face from three to four feet away, Garcia remained relatively coherent. When Officer McLouth arrived at the scene of the shooting, he found Garcia alive and coherent, not comatose. Thus, while the Court finds that Garcia consumed some drugs during the evening of October 21, 1999, such drug use did not hamper Garcia's ability to remain coherent and lucid. Garcia maintained the ability to positively identify Ucciferri as the person who had shot him and Setordepour.

█ The defendant raises several additional arguments in an attempt to discredit Garcia's testimony. The arguments lack merit. First, the defendant argues that Garcia had initially identified the shooter as Anthony Romano. There is no credible evidence, however, to that effect. Special Agent Clarence Lawrence of the Bureau of Alcohol testified that it was Setordepour who had identified the shooter as Anthony Romano. Agent Lawrence also explained that he must have been confused when he stated during his previous deposition that it was Garcia who had identified the shooter as Anthony Romano. Garcia credibly testified that he had never stated that the shooter was Anthony Romano. Rather, Garcia quickly identified Ucciferri from a photo line-up. Garcia also explained why he had not earlier provided the police with Ucciferri's name—Garcia had never met Ucciferri before the shooting.

█ Second, the defendant argues that the black pickup truck's interior dome light came on when Garcia opened the door, thus hampering Garcia's views. It is undisputed that at some point during the shooting, Garcia opened the passenger's door causing the interior light to go on. However, Garcia had already seen Ucciferri brandishing a gun. This is precisely why Garcia pulled the gun out of the glove compartment. Also, the dome light merely required a shading of the window in order to eliminate any glare. Garcia was able to see Ucciferri clearly at close proximity just seconds before he was shot in the face.

Based on Officer McLouth's 21 years of experience as a police officer, the shell casings found in the bed of the pickup truck indicate that the shooter was probably holding the gun over the back of the pickup truck, or standing on the left side of the truck when firing the gun at Garcia. At such close proximity, Officer McLouth believed that Garcia would have been able to see the shooter even with the dome light on.

█ Third, the defendant argues that the lighting in the area was too poor for Ucciferri to make a positive identification of the shooter. However, the record shows that there were several street lights in the area (low pressure sodium lights, which omit an off color yellowish light). There was a street pole light at the very area where the shooting occurred. According to Officer McLouth, the lighting conditions were "fair at best." However, the lighting present at the scene allowed Officer McLouth to see the victims' faces. The lighting was good enough to allow recognition of an individual within 25 feet.

The credible evidence demonstrates by a preponderance of the evidence that Ucciferri deliberately and intentionally attempted to kill Garcia and Setordepour by shooting each with a gun causing injury to both. Accordingly, the Court finds that Ucciferri violated the conditions of his supervised release requiring that Ucciferri not commit another Federal, State, or local crime or possess a firearm. Docket No. 113. It is respectfully **RECOMMENDED** that the United States District Court issue an order to show cause why Ucciferri's supervised release should not be revoked.

## C. Association with Known Felons

 The government, however, has failed to show by a preponderance of the evidence that Ucciferri associated with *known* felons in violation of Standard Condition 9 of his supervised release order. Docket No. 89. The government has failed to show that Ucciferri *knew* that he was associating with felons. *See United States v. LanFranca*, 955 F.Supp. 1167, 1168 (W.D.Mo.1997) (holding that the government must show that the defendant *knew* that he was associating with a felon); *United States v. Romero*, 676 F.2d 406, 407 (9th Cir.1982) (stating in dicta that "if and when probation is revoked, we will examine the findings to insure that probationer's due process right to notice . . . has been observed and to protect him from unknowing violations").

### 1. *Michael Ponzio*

Michael Ponzio admitted that he had associated with Ucciferri at Ucciferri's residence. Ponzio further admitted that he had been previously convicted for the offenses of possession of marijuana, possession of LSD, and sale and delivery of a counterfeit substance. However, the government introduced no evidence tending to show that Ucciferri knew that Ponzio was a convicted felon.

### 2. *Peter Cabrera*

During the revocation hearing, Probation Officer Fanelli testified that Peter Cabrera listed his home address as 6707 Voltaire Drive, Orlando, Florida with the Department of Motor Vehicles. Ucciferri also listed that same address as his residence. Field observation by the Probation Officer Fanelli confirmed that Ucciferri resided at that location. The evidence also showed that Ucciferri had been providing Cabrera with money each month to help with rent. Cabrera had been arrested for numerous offenses, including armed robbery, carrying a concealed weapon, possession of a weapon during the commission of a felony loitering, vehicle theft, trespassing, possession burglary. However, the government failed to show that Cabrera had been *convicted* for any of the listed offenses. In addition, no evidence was introduced tending to show that Ucciferri *knew* that Cabrera was a felon.

Although the evidence demonstrated that Ucciferri associated with both Ponzio and Cabrera, the government failed to introduce sufficient evidence showing that Ucciferri *knew* that either Ponzio or Cabrera were felons. Accordingly, the Court finds that Ucciferri did not violate Standard Condition 9 of his supervised release by associating with *known* felons.

## IV. *CONCLUSION*

For the foregoing reasons, this Court finds that Ucciferri has not violated Standard Condition 9 of his supervised release by associating with known felons. However, the government has shown by a preponderance of the evidence that Ucciferri violated the standard conditions of his supervised release—that Ucciferri not commit another Federal, State, or local crime and that Ucciferri not possess a firearm—by shooting Garcia and Setordepour on October 21, 1999. Docket No. 113. It is respectfully **RECOMMENDED** that the United States District Court issue an order to show cause why Ucciferri's supervised release should not be revoked.

Failure to file and serve written objections to the proposed findings and recommendations in this report, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02, within ten days of the date of its filing shall bar an aggrieved party from a de novo determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal. Any objections shall contain pinpoint citations to the record, which includes a transcript of the final revocation hearing on October 31, 2000. *See* Docket No. 119.

Dated: Dec. 21, 2000.